IN THE UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MINNESOTA

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION<br><br>Plaintiff,<br><br>v.<br><br>SOVEREIGN RESOURCE MANAGEMENT, INC., KEN MITRA,<br>VIRGIL E. SMITH, individually and d/b/a Maximus Capital Consultants; and<br>ANTHONY J. HEPPNER, individually and d/b/a J.T. Investments,<br><br>Defendants. | Civil Action No.<br>02-CV-1783 (MJD/AJB)<br><br><br>Honorable Michael J. Davis |

ORDER OF SUMMARY JUDGMENT FOR
PERMANENT INJUNCTION AND OTHER ANCILLARY
RELIEF AGAINST DEFENDANT ANTHONY J. HEPPNER

This matter came before the Court on Plaintiff's Motion for Summary Judgment Against Defendant Anthony J. Heppner ("Heppner") ("Motion"). The Plaintiff, Commodity Futures Trading Commission ("CFTC" or "Commission") filed a Complaint against the defendants in this case on July 18, 2002, seeking injunctive and other equitable relief, as well as the imposition of civil penalties, for violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1 et seq., and

SCANNED
DEC 05 2005
U.S. DISTRICT COURT MPLS

the Commission Regulations promulgated thereunder, 17 C.F.R. §§ 1 et. seq. Although Defendant Heppner answered the Complaint, his pleading does not create any genuine issue of material fact regarding any of the allegations set forth in the Complaint. The Court has reviewed the entire record in the case. The Court finds that Plaintiff is entitled as a matter of law to a judgment on liability against Heppner and an award of restitution against Heppner.

THE COURT FINDS THAT:

## JURISDICTION AND VENUE

1.  This Court has subject matter jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

2.  Venue properly lies with this Court pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1(e), because Heppner is found in, inhabits, or transacts business in this district, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this district, among other places.

3. Heppner, directly and indirectly, has made use of the means and instrumentalities of interstate commerce in connection with the acts, practices and courses of business complained of herein.

## THE PARTIES

4. Plaintiff, <u>Commodity Futures Trading Commission</u>, is an independent federal regulatory agency that is charged with responsibility for administering and enforcing the provisions of the Act, and the Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq*. The Commission is authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, to bring a civil action to enjoin any act or practice constituting a violation of the Act, to enforce compliance with the Act, and to seek civil penalties.

5. Defendant <u>Anthony J. Heppner</u> resides in Theilman, Minnesota. At various times from at least November 1997 to at least November 1998, Heppner has sometimes done business under the assumed name J. T. Investments. Neither Heppner nor J. T. Investments have ever been registered with the Commission in any capacity.

## STATUTORY BACKGROUND

6. A futures commission merchant ("FCM") is defined in Section 1a(20) of the Act, 7 U.S.C. § 1a(20), as an individual, association, partnership,

corporation, or trust that: (i) is engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery or on or subject to the rules of any contract market; and (ii) in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

7.  A commodity pool is defined in Commission Regulation 4.10(d)(1), 17 C.F.R. § 4.10(d)(1), as any investment trust, syndicate or similar form of enterprise engaged in the business of investing its pooled funds in trading commodity futures and/or commodity options.

## OVERVIEW OF THE SOVEREIGN POOL

8.  Commencing in approximately November 1997, a corporation called Sovereign Resource Management, Inc. ("Sovereign") began operating a foreign currency futures trading program called the "Sovereign Resource Management Club" for the benefit of its "members."

9.  Sovereign, through the acts of the individual defendants in this case, namely Ken Mitra ("Mitra"), Virgil E. Smith ("Smith") and Heppner, solicited participants' funds, and Sovereign accepted those funds in a single bank account at the National Commercial Bank of Grenada, Ltd. ("NCB") in Grenada, W.I. for the purported purpose of investing in foreign currency futures contracts.

10.   From at least October 1997 until at least February 2000, the defendants collectively solicited 356 participants to invest in the Sovereign commodity pool, most of whom reside in Minnesota.

11.   Individual Sovereign participants invested varying amounts, ranging from at least $493 to $252,000.

## HEPPNER'S FRAUDULENT SOLICITATIONS FOR THE SOVEREIGN POOL

12.   Heppner met with prospective participants in Sovereign to discuss with them an investment in Sovereign, and held meetings in Rochester, Minnesota to solicit investments for this purpose.

13.   Heppner solicited participants for investment in Sovereign and accepted investments from 38 participants from January 1998 through at least November 1998.

14.   While soliciting Pool participants to invest in Sovereign, Heppner knew that the following material statements were false or recklessly disregarded the fact that the following material statements were false when he made these oral or written representations to participants and potential participants:

(a)   60% of each participant's funds would be invested in foreign currency contracts;

(b)   the remaining 40% of each participant's funds would be held in reserve to "minimize potential losses;"

(c)   participants would achieve a 52% rate of return per month;

(d)   Heppner's personal investment had returned to him a profit of 40-50% per month; and

(e)   participant funds could be withdrawn from Sovereign at any time.

All Sovereign pool participants solicited by Heppner reasonably relied on one or more of these or other material false statements in making the decision to invest their funds with the Sovereign pool.

15.   None of the persons solicited by Heppner for an investment in Sovereign ever received adequate disclosure documents warning of risks from Sovereign or Heppner.

## CASH FLOW ANALYSIS OF SOVEREIGN PARTICIPANT FUNDS

16.   Potential Sovereign pool participants completed a "Sovereign Currency Trading Program Request to Participate Application" ("Application"), which delineated the terms and conditions of their participation in the program. The Application also included specific wire instructions for the participants to send their funds to Sovereign's bank account at NCB.

17.   Most participants transmitted their pool investment by wire to the Sovereign bank account at NCB in Grenada, using Bank of New York ("BKNY") as a correspondent bank to effectuate their transfer.

18.  Between October 1997 and February 2000, 356 participants invested a total of more than $3.8 million in Sovereign.

19.  Of the more than $3.8 million invested in Sovereign, and after taking into account the return of funds to Sovereign participants, a judgment of $3,127,752 for restitution owing to Sovereign participants was entered against Sovereign, Mitra and Smith on March 26, 2004.

20.  A survey of all FCMs registered with the Commission reveals only one commodity futures trading account in the name of Sovereign. In November 1997, Mitra, on behalf of Sovereign, opened a futures trading account under the name "Sovereign Resource Management, Inc." at an FCM called Professional Market Brokerage, Inc. ("PMB") located in Chicago, Illinois.

21.  Sovereign made several deposits into the futures trading account at PMB totaling $206,405, which came from the NCB bank account. From February 1998 until March 1999, the account actively traded futures and lost a cumulative total of $142,855. The account also paid an additional $50,548 in broker fees and commissions to PMB and its associated persons and another $15,000 for management fees, leaving a deficit balance of $1,998 in April 1999, at which point the account was closed. Additional commodity broker fees and commissions of $16,000 and $17,900 were paid by Sovereign directly out of its bank account, and when those sums are combined with the $206,405 in losses in its trading account, the total trading losses amount to $240,305.

22. Sovereign had losses every month it traded commodity futures through its account at PMB. Monthly losses in its PMB account ranged from $225 to $66,250.

23. Sovereign prepared and sent periodic "Currency Trade Statements" to participants from its office in Grenada that showed the profits for each participant's account based on the pool's trading activity.

24. Sovereign's Currency Trade Statements never reported any trading losses to participants; rather, they only stated purported individual participant's "earnings."

25. Sovereign participants were never told of any trading losses in their account for any given period of time.

26. An individual participant solicited by Heppner, Chuck Mohs, received a Currency Trade Statement dated May 1999 from Sovereign that showed purported earnings of $442,602 for the period February 1998 through May 1999. For that same time period, Sovereign's commodity account at PMB incurred cumulative losses of $208,404.

### HEPPNER'S MISAPPROPRIATION OF PARTICIPANT FUNDS

27. Heppner sometimes told Sovereign participants that they could either wire their funds directly to Sovereign's account at NCB, using BKNY as a

correspondent, give him cash or make checks payable to him or to his personal account operating under the assumed name "JT Investments."

28. Heppner solicited $240,399 from 38 Sovereign pool participants to be used for trading foreign currency futures.

29. An approximate total of $90,551 was sent directly to Sovereign by persons solicited by Heppner. Heppner also accepted and deposited $149,848 from Sovereign participants into one of the following three bank accounts over which he had control: "Tony Heppner or Joyce Heppner" account at the First National Bank in Plainview, Minnesota, "Anthony J. Heppner or Joyce V. Heppner" account at the Marquette Bank in Rochester, Minnesota or the "JT Investments" account at the Marquette Bank in Rochester, Minnesota. Heppner then transferred to Sovereign approximately $85,402 of participant funds that were initially deposited into one of his accounts.

30. From the $240,399 solicited by Heppner, Heppner returned approximately $12,371 to participants, leaving a net sum of $228,028 owing to participants by Heppner. The identity of those participants and the amounts that they are owed are set forth in Exhibit A attached hereto under seal.

31. A total of $52,075 of funds that Heppner accepted from Sovereign participants and deposited into one of his bank accounts was not used by him for foreign currency futures trading. Therefore, Heppner misappropriated that sum and enriched himself by that amount.

32. Approximately $35,000 of the $52,075 of participant funds that was not used for foreign currency futures trading was instead transferred to an account named MCM, LLC ("MCM") at the U.S. Bank in Minneapolis, Minnesota that Heppner jointly owned with other Sovereign participants. Heppner then intentionally wire-transferred most of those funds to an account at the Bank of America in Nevada, unrelated to Sovereign. The other $17,000 remained in Heppner's JT Investments bank account and was intentionally not sent to Sovereign to be used for foreign currency futures trading.

33. According to Heppner, MCM was a firm called Mentor Concepts of Minnesota that was a public utilities company in the Chicago metropolitan area.

34. Defendant Heppner orally represented to pool participants that he had been able to retrieve his investment funds from Sovereign.

35. Although some Sovereign participants have made oral and written requests to Heppner for a return of their Sovereign investments, they have not been repaid.

## VIOLATIONS OF THE ACT AND REGULATIONS

36. Heppner violated Sections 4b(a)(i) and (iii) and 4o(1)(A) and (B), 7 U.S.C. §§ 6b(a)(i) and (iii) and 6o(1)(A) and (B), by misappropriating Sovereign participant's funds, making material misrepresentations to Sovereign participants and prospective Sovereign participants and failing to report losses to participants.

37. Heppner violated Section 4k(2), 7 U.S.C. § 6k(2), by soliciting funds from participants for participation in a commodity pool and therefore acting as an associated person ("AP") of Sovereign, a CPO, without the benefit of registration as an AP.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT** final judgment shall be and hereby is entered in favor of Plaintiff Commission and against Defendant Heppner as follows:

A. Defendant Heppner is permanently restrained, enjoined and prohibited from, directly or indirectly:

1. Cheating, defrauding or deceiving investors in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof, in violation of Section 4b(a)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(i) and (iii);

2. Directly or indirectly employing one or more devices, schemes, or artifices to defraud pool participants or prospective pool participants, or engaging

in transactions, practices or courses of business which operate as a fraud or deceit upon pool participants or prospective pool participants, or engaging in transactions, practices or courses of business which operate as a fraud or deceit upon pool participants or prospective pool participants, in violation of Section 4o(1)(A) and (B) of the Act, 7 U.S.C. § 6o(1)(A) and (B).

    B.    Defendant Heppner is permanently restrained, enjoined and prohibited from soliciting, accepting, or receiving from others, funds, securities, or property, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market without being registered with the Commission as an AP of a CPO, in violation of Section 4k(2) of the Act, 7 U.S.C. § 6k(2)

    C.    Defendant Heppner is permanently restrained, enjoined and prohibited from directly or indirectly engaging in any commodity futures or options related activity, including but not limited to:

    1.    Trading on or subject to the rules of any registered entity;

    2.    Engaging in, controlling or directing the trading for any commodity futures, security futures, options, options on futures, or foreign currency futures or options account for or on behalf of himself or any other person or entity, whether by power of attorney or otherwise;

    3.    Soliciting or accepting any funds from any person in connection with the purchase or sale of any commodity interest contract;

4. Placing orders or giving advice or price quotations or other information in connection with the purchase or sale of commodity interest contracts for themselves and others;

5. Introducing clients to any other person engaged in the business of commodity interest trading; and

6. Issuing statements or reports to others concerning commodity interest trading.

D. The injunctive provisions of this Order shall be binding on defendant Heppner, and any person insofar as he or she is acting in the capacity of an agent, servant, employee, successor, or assign or attorney of defendant Heppner, and upon any person who receives actual notice of this Order by personal service or otherwise insofar as he or she is acting in concert or participation with Heppner.

**IT IS FURTHER ORDERED THAT:**

1. <u>Restitution</u>. Within thirty (30) days of the date of this Order, defendant Heppner shall jointly and severally pay restitution in the amount of $228,028 ("Restitution Amount"). In addition, Heppner shall pay pre-judgment interest thereon from July 18, 2002 to the date of this Order calculated at the underpayment rate established by the Internal Revenue Service, pursuant to 26 U.S.C. § 6621(a)(2). Heppner shall also pay post-judgment interest at the Treasury Bill rate prevailing on the date this Order is entered, pursuant to 28

U.S.C. § 1961(a), from the date this Order is entered until the date full payment of restitution is made, or such other amount that the Plaintiff may prove is equitable and justly owed. The persons to whom the Restitution Amounts shall be paid, and pro rata distribution percentages by which each investor shall be paid from the Restitution Amount are set forth in Exhibit A attached hereto under seal. Omission from Exhibit A shall in no way limit the ability of any investor from seeking recovery from Heppner or any other person or entity. Within thirty days of the date of this Order, Heppner shall provide the Restitution Amount to the National Futures Association ("NFA") c/o Daniel A. Driscoll, Esq., Executive Vice President, Chief Compliance Officer, or his successor, at the following address: National Futures Association, 200 West Madison Street, Chicago, IL 60606 under cover of a letter that identifies the defendant making payment and the name and docket number of the proceeding. The NFA will subsequently distribute the funds to investors in accordance with Exhibit A.

2.   <u>Civil Monetary Penalty</u>. Within thirty (30) days of the date of this Order, Heppner shall pay a civil penalty of $156,225 to the Commission sent to Dennese Posey, or her successor, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, DC 20581, under cover of a letter that identifies defendant making payment and the name and docket number of the proceeding.

3.  Heppner shall not transfer or cause others to transfer funds or other property to the custody, possession or control of any other person for the purpose of concealing such funds or property from the Court, the Commission, or any officer that may be appointed by the Court.

4.  This Court shall retain jurisdiction of this cause to assure compliance with this Order.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Ordered this ___5ᵀᴴ___ day of ___Dec.___, 2005

_____
United States District Court Judge